Good morning, everyone. Welcome. We'll begin with our first case, Smith v. Sipi. Mr. Jarosz. May it please the court, Arthur Jarosz on behalf of plaintiffs appellants Dawn and Keith Smith, good morning to the court, good morning to counsel. I would like to focus my argument this morning on the amicus brief of the National Tax Lien Association because I did not have sufficient length in my reply brief to address the arguments there and understand the court has already carefully perused the briefs and I don't want to repeat the arguments made therein. Of course the court is aware that we are seeking that this court reverse the district court and agree with the bankruptcy court that we the plaintiffs met our burden under section 548 demonstrating that there was a transfer for less than full and bankruptcy court had ruled in favor of the plaintiffs. However, we're also asking this court to correct and reverse both of the lower courts below in terms of two things. Number one, their findings in favor of the transferee Midwest Capital and the limitation of the monetary recovery under section 558 wherein the bankruptcy court limited us to a single homestead exemption of $15,000. So those are the three kinds of relief we're seeking from the court. So you want the homestead exemption or do you want the alternative in monetary value? Yes, we are seeking the monetary value as Judge Black awarded in limited dollars based on the homestead exemption because the course of the bankruptcy proceeding and section 550A allows the court to award money in lieu of an in specie return of the property, we don't want the property that was wasted while it was under Midwest Capital's dominion and control. We would rather have the value which section 550 allows. In addition, we should not be limited to the homestead exemption. We probably, our position is we don't even need to reach that because under the I-notor decision, the plaintiff Smith are not only the debtors but the debtors in possession and under the I-notor decision of the district court below, debtors in possession in the chapter 13 case have plenary power of the trustee to set aside the transfer for all purposes. So is the theory that the debtors get to get all the value of themselves? No, it would have to be paid for under the plan and of course under the special term of the plan, the first thing that gets paid are the taxes that have been advanced with interest and carrying costs. So 548C requires that the first dollars go to repay SIPI. Midwest may also have a claim if it can meet the standards under section 550 of the code. The original plan also provided that the recovery would increase the percentage to general unsecured creditors. Whether that happens or not is questionable in light of the actual filings of creditor claims, but under the original plan, the percentage being paid to general unsecured would increase by any recovery. In addition, I myself have an administrative expense claim bearing the burden of this litigation, this 2007. So my own firm is in a sense an administrative expense claimant. So the SPIS would not capture the entire recovery, Your Honor. So I'm trying to also focus on the implication, the implications that would occur if we agreed with your position because it seems to me the implication of your argument that tax sales in Illinois, the implication would be the tax sales in never produce reasonable equivalent value. And does that also mean that all tax sales are then subject to being voided in bankruptcy? Not at all, Your Honor, because under section 548's constructive fraudulent transfer provision, it's not enough to show transfer for less than reasonably equivalent value. You also have to show the debtor in bankruptcy or the trustee has to show that the transfer rendered the debtor insolvent or that the debtor was already insolvent. Right, but your position with respect to your claim against Midwest is that those conditions will be so often met that in essence we ought to presume that the conveyance is fraudulent if it's challenged in bankruptcy court in a timely basis, right? Only because this was a homestead. As we Because it's a residence. Yes, yeah, sure, sure. Right, and that distinguishes it from commercial properties where an owner might let it go to tax sale has nothing to do with the financial condition necessarily of the owner. But in a homestead being occupied, yes, the prior case decisions from this district indicate that generally distress is indicated or presumed. Now, we're not saying that causes an irrebuttable presumption. What we're saying is that under the Seventh Circuit's bonded financial decision, there is some modicum, some lesser knowledge that Midwest had indicating to possible financial distress, insolvency. Right, but to go back to Judge Williams question, it seems to me the logic of your position is that at least any tax sales of a residence in Illinois, the title will remain uncertain for at least two years, right? Well, the tax deed transfers title and just as any deed of real estate, yes, there's a possibility. It's uncertain for two years, right? There's a possibility of a 548 attack. Yeah, but so most tax purchasers would be subject to more years of clouded title over their property, right? There would be uncertainty as there is with any deed. Any deed, whether in a tax sale context or otherwise, can be subject to attack under Section 548. I guess my question, Mr. Jarrell, of several, but I guess this is still, your position has a pretty sweeping logic, but as a practical matter, this is a pretty unusual case, isn't it? That is, where there's a tax sale and neither the owner nor a mortgage lender steps in to redeem the property in time? Yes, in fact, SIPI testified in deposition testimony at Plaintiff's Exhibit 28 and also at trial document number 290 that this occurs in only about 1% of the cases. In almost, in 99% of the cases, according to SIPI. Cases or sales? In 99% of tax sales, the redemption occurs before the tax deed is issued. So yes, this is an unusual case. This is not like mortgage foreclosure practice, where a deed invariably is issued as a result of the mortgage foreclosure sale. Here we have tax deeds being issued in at most 1% of the cases, and then those subject to attack under 548 would have to have the insolvency test met. If we agree with you, Mr. Jaros, can we do that without creating a circuit split with either the Fifth Circuit or the Tenth Circuit? Yes, I don't see any split at all. The TF Stone case from the Fifth Circuit, your honor, involves state law procedure where there actually was a bidding process for the property itself. Where you bid up. Yes. Yes, it wasn't a bidding down. And what about the Tenth Circuit? In Grandote also had a competitive bidding procedure under Colorado law, citing to Colorado Statute section 39-11- I believe it's 108, your honor. So both of those are distinguishable and there would not be any circuit split. Judge Pepper, in the Williams case from the Eastern District Bankruptcy Court, Eastern District of Wisconsin, not too long ago, ran through the case authorities and also noted that the bankruptcy appellate panel for the Tenth Circuit in Sherman handled the issue present here, which is under Wyoming real estate delinquent tax practice. The sale was simply for the amount of the taxes, just like it is here. And the Sherman court 223 BR 555 held at 548 can be used. That the BFP rational does not apply where there is no a bidding process for the property itself. So let me turn to potential purchasers like Midwest and the whole issue of whether it's a fraudulent sale or not. What facts do you think are enough to trigger a purchaser's duty to investigate? As to lesser knowledge, which this court spoke of in the bonded financial decision, that lesser knowledge is that the property that was sold was a homestead. And that the homestead itself is clear indicia where there's a tax sale of financial distress. So I believe that that lesser knowledge required Midwest to at least make inquiry as to whether or not this apparent distress was actual distress. And to actually compare any measure of the value of the property with the amount that SIPI, as a matter of public record, paid for the taxes. So you think that Midwest then, that could have made a difference or should have made a decision to purchase. Let's assume they did do such an investigation. Yes, and if they had, if as a result of a reasonable inquiry they had determined that the Smiths were still solvent, then they would go ahead and buy. But if their inquiry demonstrated that the Smiths were rendered insolvent. How exactly are they supposed to investigate somebody else's finances? All they have to do under bonded financial is to make an attempt. What does that mean? Because they're not a customer. They don't have any direct commercial relationships. They're not seeking a loan. Sure, so in this case all they had to do was go to the home where the Smiths were still in residency, knock on the door and make inquiry. And if the Smiths refused to answer about a financial question, then their inquiry is done. But they didn't make any effort at all. They didn't check the public record for judgments against the Smiths. They did nothing. And that's what bonded financial says they cannot do. If they do nothing, then they are stopped from denying the knowledge that they could have gained by making inquiry. Can I ask you one other, I guess a question of economics, Mr. Jaros. If we sell titles, we'll have an extra vulnerability for a period of two years. Help us understand, and I assume that's going to make that a somewhat less attractive investment than it is now for folks like SIPI and Midwest. Where do you see the burden of that extra risk falling as a matter of economics? Does it It does not fall on the governments at all. The governments are going to get their tax money from the tax buyers. Because remember, the Illinois statutory scheme is that on the defaulted taxes, the rate starts at 18%. So that rate is always available. It's just a function of how much that rate is bid down in the marketplace. And more importantly, 18% for a six-month period or a year? I believe that's the annualized rate. But if we actually look at the statute, your honor, the statute provides for a multiplier effect if redemption doesn't occur within 30 days of the sale. The sale is a bid down on the interest that they'll accept. Right. And that bid down rate then has a multiplier if redemption doesn't occur within so many months. And it's a stepped-up multiplier. But in addition, subsequent taxes, taxes that come due after the tax sale that the That's a great return in today's interest rate market. So to answer the court's question, SIPPY acknowledged in its deposition testimony at Plaintiff's 26 and again at document 290, the trial transcript, that what would happen is that the interest rates might not be bid down as much. And that's possible. We don't. So if that, that would be rational. And so that would suggest that the who want to redeem their delinquent taxes, right, would end up having to pay more to investors like SIPPY. Fair enough. But that is certainly far from wreaking havoc with the tax collection system of the state of Illinois. It has nothing to do with that. The government... You're under your rebuttal time. All right. Thank you very much. I mean, you can go on. That's what the white light means. So it's just taking time from your rebuttal. All right. Go on if there's more you want to say. We try to be very protective of rebuttal time. Thank you, Your Honors. So 35 ILCS 200-21-355B has this ratcheting up of the bid rate if redemption doesn't occur promptly. Up to six times the bid rate if redemption occurs after 30 months. 35 ILCS 200-21-35, 355C and D provides for the fixed 12% rate of return on subsequent taxes. And SIPPY acknowledged this again in its deposition and trial testimony. I wanted to address very quickly the arguments in the amicus brief. Let me skip over to page 7 and 8.3 on the National Taxing Association's amicus brief where they raise 108B. Well, they say if a party can wait 20 months, 29 months to seek relief, the requirement that a party seeking relief under 108B or to include delinquent taxes in a plan filed for is expired would be rendered meaningless. Not at all. 108B is available whether there's an insolvency or not. It's broader, so it has a shorter time period, whereas 548 is available only in insolvency cases. And I think that's a key point that the amicus for the defendants overlooked. In addition, let me come to page 10.5. The bankruptcy court decision supposedly would validate many governmental transfers, and they talk about, at the bottom of page 10, state taxing authorities and the IRS can cause property to be sold to satisfy delinquent tax obligations. If those sales occur under an auction bidding, which I believe they do, then it's totally different. Then you're under the BFP rule. The point is that the Illinois real estate tax sale doesn't have an auction bidding. You can't, the buyer isn't even permitted to bid based on the value of the property. The maximum bid, the only bid, is the amount of the real estate taxes. The only thing that's bid down is the interest rate. Right, that's correct, Your Honor. Absolutely. Finally, my last point, at the bottom of 10, the amicus says federal and state laws authorize law enforcement agencies to forfeit property, and they raise the specter that forfeited property could then be subject to 548 attack. Well, 21 U.S.C. section 853 K2 is the criminal forfeiture provision, and case law holds that that overrides 548. Two different provisions of federal law. Federal criminal forfeiture law says cannot bring it back. 548 says you can. There's a conflict in the federal statute, Stetton v. Alou, 57 Bankruptcy Court Decision 11, Southern District of Florida, 2012, decided that issue and said 548 isn't available. The provision of the federal criminal law overrides or trumps. So yes, in-state forfeitures might be brought back. In fact, Liberty Mutual v. New York says it might. 428 BR 562, Bankruptcy Eastern District of New York, 2010, and Tower Environmental 260 BR 213, Bankruptcy Middle District, Florida, 1998. Thank you very much, Your Honors. Thank you, Mr. Charles. Mr. Moskowitz. If it pleases the Court, Your Honors, I am Harold Moskowitz. I'm representing Appalachee SIPI, LLC. And in fact, what I'm really doing here today is trying to uphold the Illinois system of the collection of delinquent real estate taxes, which is a balancing act, which the state has a system whereby it has a delinquency collection system enabling property owners to redeem for over a long period of time at the lowest cost possible and at the same time the county able to collect its money and at the same time allowing the title to real estate to be upheld and secured. So your position is totally a noble one, you're doing this. I do the work of justice and the American way. I shouldn't doubt it at all. There's no profit motive in what you're doing. Well, profit is an American motive. Maybe an American motive, but it's not a pure donor position. I don't want to get you too patriotic. But in fact, the system that Illinois has doesn't provide a lot of profit to tax buyers in general. A lot of tax buyers pull around investing money in it. Somebody thinks that there's money to be made. Well, yes, there are some interest rates, but you have the situations where, as the court really knows from the Phoenix Bond Bridge case, that a majority, say in Cook County, the majority of all real estate tax sales are at 0% interest. Yeah. So they're counting on getting a property, not the interest. They're not counting on it. That's because most of the properties do not go to deed, but they're hoping. That is the That's right, but that's the same. Actually, they're counting on enough so they're going to make money. Yes, Your Honor, but that's the same stick that the county has to use. But it's a stick that, without it, people wouldn't pay the real estate tax. I don't want to eulogize the tax buyers and put them in a position where I think that they're noble souls floating around. Okay, thank you, Your Honor. So I want to know if you agree with Is it about 1%? I think it's a little bit higher, but it's not a substantially high percentage. Most cases, whether, especially residential real estate, there's usually a bank involved, and if the owner of the property doesn't redeem, many cases the tax buyer redeems. But, you know, it depends. For example, if the property might be in Highland Park, you'd have almost 0% going to deed. If it's in Harvey or in Dalton, you'd have a substantially higher percentage of going to deed. And, matter of fact, higher percentage of higher interest rates. So why is 548C insufficient to protect tax purchasers' interest if the transfer is avoided? Well, because it puts the tax purchaser in a cage for five, seven years. He can't sell the property if he goes to a deed because no title company will provide him with title insurance. He'll have difficulty in getting banks to lend him the money to go to a tax deed to buy tax certificates. It will have a subject, as you heard from counsel, they want, because of waste, they basically want a tax buyer to sit there and improve the property, rent the property out if it's vacant, pay all the real estate taxes, pay the property insurance, keep it up, and if someone vandalizes it, it's your fault and it's your problem. And this is years after I particularly own the property, or I particularly try to go, excuse me, and rehab the property. That's what they want to do. We are now indentured lenders to a tax purchaser owner because at the end of the day, we have to wait two years under 548, four years under the Illinois Fraudulent Transfer and Conveyance Act. So, and this is after a two-year period where you didn't pay taxes, a two and a half to three-year period where you had to redeem, then I have a number of months where I have my petition until I get an order granting me deed, and then I had this two to four-year period on top of that. So, why would I buy on a 0% interest on a property that I can't do anything with, but incur expenses at the risk of being sued for not paying the expenses for years? Well, given, I mean, several bankruptcy courts in Illinois have set aside transfers for tax lien sales under 548. I don't know about several, there have been a couple of cases. The McKeever case way back when talked about it. Murray, on the other hand, which was a Judge Squire's opinion, said no, 548 is not applicable. And it doesn't make sense that 548 should be applicable because 540, under BFP, it says that, and I think it's on page 547 of the opinion when it discussed the dissent in BFP. It said the question of what is a foreclosed property worth? The same applies here. The fact that it's not foreclosed, but it's a tax sale, what is a property about to be sold at a tax sale, or was sold at a tax sale, what is that worth? Here's what concerns me about that part of your argument, Mr. Moskowitz. We know courts aren't perfect at determining market value, but in fraudulent determination. It may be rough, approximate, but if there's a large enough gap between an estimated value and what was actually paid, that question arises in every fraudulent conveyance case, right? It does, except BFP answered that question by saying under certain cases, which is basically a forced sales situation, where one cannot assume that the regular market forces are at work. I really can't determine what the price is, so therefore, since I cannot determine, not that it's difficult for me, or there's some way, if I thought long enough about it, I might be able to come to a determination. BFP says I can't make that determination at all. Therefore, we're going to automatically assert that the answer to the question of what is it worth, is what was it sold for? Okay, but obviously, there's a pretty different sort of bidding process at work, isn't there? There is, but... Why doesn't that make a difference? Well, I'll give you an example. I cited in my brief a study about Baltimore, where Baltimore is a bidding state, and I think it was 2010, there were 6,000 properties sold at the annual tax sale, of which there were five properties that had an overage. So in that kind of case, the distinction is really no different for that one or two cases that there's an overage. I'll give you a state of Indiana. The state of Indiana literally costs twice as much money to redeem every property, and I get a third of the time to redeem. I got one year in Indiana, I got an automatic 10% interest rate on every bid, and I got a 10% penalty of any overage against the debtor. So if you work out, for example, if you had a $5,000 tax lien, you'd automatically have to pay $500 in interest, and you'd have to pay, and let's say there was at the $5,000, they bid $50,000, I'd have to pay $49.50, which would be the difference of the bid and whatever in a penalty. So I'm doubling the interest rate, excuse me, I'm doubling the redemption amount on each and every property, which would be borne by the owner of the property. Illinois says, we're going to do it different so that the owner of the property can actually get his property back, and that's why in Illinois the percentages are low, because it's not that expensive to get your property back. So that's why, in fact, Mr. Jarrell says it's not like mortgage foreclosures, he wants to make it like mortgage foreclosures. It will be just as bad to owners of property as mortgage foreclosures is. If they couldn't pay the $5,000, according to Mr. Jarrell, because they're insolvent, how are they going to pay $10,000 if I add penalties like Indiana does? So under that kind of circumstances, that's exactly what is going to happen, and Your Honor has had the right question when it says, who's going to be bearing the economics of that? Who's going to bear it? It's the county. The county needs money on an ongoing basis. How is the county going to bear that? Because if there's less tax buyers, there's more properties that won't be sold at a tax sale, and therefore all the tax that was due on those properties will never be collected. Are properties going unsold in Illinois now? Yes. Not a lot. Percentage? Not a lot, but there are some that will be more. I mean, why would I, I brought Dalton and Harvey Ford, why would I even bid on that kind of property at the risk of being sold under 548? I might as well just depend upon people who live in Highland Park and go after those properties. And now we have a system where people in Highland Park have to pay real estate taxes, but people in Harvey and Dalton won't have to because they have no fear of losing their property. Well, there's a second sale in the event there's no bidding in the first sale. Is there not? There is a process called a scavenger sale. Yes, indeed. In a scavenger sale, the bid is anything to $1, if you want. It could be, but they're still properties, they're not sold as scavengers. And if there's no sale, or even if there is, any government that has a tax link can foreclose a ticket themselves in fee simple. They could, but that doesn't mean they can't be sued under this theory, under 548. That the government can't be sued? That's right. If they receive it at a scavenger sale, they're subject to being sued? The cases, the New York cases that take the position that— New York, I'm discussing here now. Well, but those are cases, in Illinois, there's a strict foreclosure so that the county actually immediately takes over and controls the property. Well, it wouldn't just be the county. The city would have a right to receive the property too, wouldn't it? The city has no right. Because the real estate taxes belong to the county. Special assessments are city laws. Oh, okay. So, regarding special— So, their taxes include the special assessments. Your Honor's correct. So, they could take it, yeah. Your Honor's occasionally right. Well, I've been married a long time, and I'm usually not right according to my wife, so. And I was married 56 years and never missed being right. My wife agreed with me on it. The hell she did. She's going to rise up from her grave here and you make that statement. So, I want to ask you a question on the tax sales procedures, if you could clarify for me that were challenging Kojima and T.F. Stone. Did they involve competitive bidding for foreclosed properties? They did in part, yes, Your Honor. But as T.F. Stone, which is the Fifth Circuit case, says, which has also a limited sale, although the sale amount is generally in the Fifth Circuit, the amount of the tax is there. It correctly said that under BFP, a forced sale is a forced sale. And it makes no difference whether there is some kind of bidding process or there's not any kind of bidding process. The same analysis and the same theory would apply. So, the mere fact that in the Tenth Circuit there, there was some kind of bidding, doesn't make the fact that, in general, BFP should not apply. My time is over. All right, thank you. Thank you, Your Honor. Thank you, Mr. Moskowitz. Mr. Bregman? Good morning. May it please the Court? Counsel? My name is Michael Bregman. I represent Midwest Capital Investments, LLC. I'd like to begin by saying that we agree with SIPPY that the transfer is not voidable under Section 548, but assuming for the sake of argument that it is, the Bankruptcy Court correctly found that Midwest Capital successfully proved its affirmative defense under Section 550B at trial and is, therefore, shielded from liability. And I'd also like to point out that the one legal issue that both sides agree with is that the proper standard of review is whether or not Judge Black, Bankruptcy Court's decision on that issue, on Midwest affirmative defense, is clearly erroneous. And Judge Black's fact-finding on that issue involved a choice between two views of the evidence, and his finding that Midwest proved its defense after evaluating the testimony of witnesses simply cannot be clearly erroneous. The Reviewing Court, of course, defers to his opportunity to hear the live testimony of witnesses and to judge the credibility of those witnesses, and there was testimony from Mr. Rockman of SIPPY, Mr. Livershire of Midwest Capital, both Don Smith and Keith Smith. I'd like to also turn to the questions which the Court posed to Appellant. The issue of whether or not an investigation was practical for Midwest Capital, which was raised by the Court. Your Honor, that investigation would not be practical. And by bonded financial services versus European American Bank, the case which counsel relies upon actually makes that very clear. And I will very briefly refer to that decision of this Court, which explicitly says 550B leaves with the initial transferee the burden of inquiry and the risk of the conveyance is fraudulent. And I think the main idea of that opinion, which, by the way, determined that the subsequent transferee was not liable and that any investigation on his part would have been fruitless. So I take issue with the argument that Midwest Capital did not do its due diligence in this case. Mr. Bregman, in this tax sale process in Illinois, does the county ever take title to the property? No. I believe that when the tax deed is issued, it's issued to the tax purchaser. So title goes directly from the taxpayer who's in default to the tax buyer? I would say that the county is more of a facilitator in that regard. As distinct from a transferee itself? Correct. Thanks. And turning to the facts of the case that were presented at trial, there was evidence testified to by Mr. Libisher, the principal manager of Midwest Capital, that Midwest had no involvement in SIPPY's acquisition of the property, did not know the property even existed until several weeks after SIPPY obtained its deed. After learning about the property, Midwest did an inspection, and the two parties negotiated over a four-week period of time agreeing on a purchase price and how title would be transferred. Midwest obtained a title search, which revealed SIPPY's ownership of the property and that there were no clouds on title. And prior to purchasing the property, Midwest had no knowledge of the Smiths' finances, their reason for their failure to pay real estate taxes, and also, very importantly, their intention to file bankruptcy. And on top of that, the Midwest Capital purchased the property in order to rent it to tenants consistent with its business. And so these facts clearly illustrate that Midwest's purchase of the property was an arm's-length transaction, which goes directly to the element that Midwest purchased the property in good faith under Section 550B. And turning to the case of Butler v. LaCar, which the appellants rely upon in their briefs, that case actually also corroborates the fact that an initial transferee, a tax purchaser, under 548C acts in good faith so long as there's nothing improper about the tax sale. So what about this opposing counsel says Midwest should have gone to the home, should have made inquiry of the bin owners and gotten more information about their circumstances? There's no requirement to do that. And there was no evidence presented at trial that such an inquiry would have borne fruit. The evidence actually showed that any kind of letter would not have produced any information. And as the court noted, the Smiths would have been under no obligation to provide that information. They were not a customer. Midwest Capital was not a bank. So I would say that there is no, barring any facts which cry out for investigation, there would be no requirement to do such inquiry. What the facts presented was a tax sale conducted in full compliance with Illinois law, followed by a purchase for good faith and for value, without knowledge that the tax sale could ultimately be voided in bankruptcy. There are no facts, there were no facts that were available to Midwest that made this transaction, the tax deed transaction, suspicious, no red flags of fraud. There was nothing like that. Have you attended tax sales? I have not. Pity. Turning, Your Honor, to the second element, which is the knowledge of the voidability of the transfer. Those two elements, the good faith and the knowledge of voidability, those two elements this court has actually left open may even overlap, may not even be that different. And we would just submit that there were no facts which raised any red flags, that Midwest needed to conduct any investigation, even if one was required, which it was not, and that this transaction, this purchase by Midwest Capital, was a good faith purchase,  Thank you, Mr. Fregman. How much time does Mr. Jaros have? Two minutes, Mr. Jaros. Thank you, Your Honors. I assume you've attended tax sales. I have not, Your Honor. You've never? No. My. Turning first to Mr. Moskowitz's statement that most tax sales are bid out at 0% interest, there is no evidence in the record of that. In fact, the record evidence is to the contrary. Plaintiff's 28, page 22, SIPPY's principle testified as follows in response to my question. In your case for SIPPY, if you or a representative of your company is at one of these auctions and is the only person present for that property, how is your opening bid determined? Most cases it will be 18, the maximum bid, meaning 18%. Then he went on to explain his testimony. In general, my first bid at every sale is 18% until I figure out what the general floor or rate is going to be for the day. Then I usually will open up with that unless there's a lower quality property that I don't anticipate other people bidding on, in which case then I will go back up to 18%. There is no evidence of 0%. In addition, counsel ignored the fact that subsequent taxes paid by the tax buyer bear a fixed 12% rate, not 0%. It is always 12% by Illinois statute. As to the 1% who don't redeem, this is found specifically at Plaintiff's 28, received in evidence under Federal Rule of Civil Procedure 32A3, Plaintiff's 28 at page 17. SIPPY's principle said in response to my question, here's my question, so what is the expectation of profit off this third of the three that you listed, namely the deed, the three ways of profiting? Answer by Mr. Roachman, I don't think we have an expectation because 99% of the items pay off and are redeemed before we ever take a deed. There's the 99%. That's what's in the trial record. That's the evidence, just not only my view. Murray, I don't believe, if I remember right, I don't think Murray was actually decided under 540. I think the Murray court said by analogy, BFP should apply. That analogy is false for the reasons set forth in our brief. That is mere dictum should not be followed by this court. Judge Pepper in the Eastern District case of Williams carefully went through the analysis, explained why BFP's principle has no bearing. Do I have any more time or not? No, you don't, Mr. Jarrus. That's it. Time's up. Thank you very much. Trap door will open right below you. Thank you. We'll take the case under adjournment.